UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


UNITED STATES OF AMERICA,     )
     )
         Plaintiff,     )
     )
     vs.     )
     )     Case No. S1-4:07CR00184 ERW (AGF)
SPENCER MITCHELL,     )
     )
         Defendant.     )


## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the pretrial motions filed by Defendant, Spencer

Mitchell. Pretrial matters were referred to the undersigned United States Magistrate

Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress electronic

surveillance (Doc. No. 252), a motion to suppress physical evidence and a motion to

suppress statements (Doc. Nos. 253 & 254, respectively). Defendant Mitchell thereafter

waived his right to proceed on his motion to suppress electronic evidence (Doc. No. 252),

and withdrew that motion.

An evidentiary hearing was held on Defendant's remaining suppression motions

on August 24, 2007. The government was represented by Assistant United States

Attorney Dean R. Hoag. Defendant was present and represented by his attorney, Patrick

S. Kilgore. At the hearing, the government presented the testimony of four witnesses:

Special Agent (SA) James Stroop, an agent with the Drug Enforcement Administration

(DEA); DEA Task Force Officer ("TFO") John Christiansen, who has been assigned to the DEA for approximately two years; TFO Tom Sawyer, employed with the St. Louis Metropolitan Police Department ("SLMPD"); and Officer Jim Joyner, employed with SLMPD in the Mobile Reserve unit. The witnesses were cross-examined extensively by defense counsel. The parties were given leave to file post-hearing memoranda, after which the matter was taken under advisement. Trial is scheduled for October 29, 2007.

Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In the winter and spring of 2005, members of the DEA Task Force, including SA Stroop, began an investigation into a narcotics operation in the St. Louis area. In connection with their investigation, the Task Force conducted surveillance on several telephones, pursuant to court-ordered wiretaps, including the telephones of co-Defendants Eric Earnest and Sammy Jefferson. On approximately June 9, 2006, SA Stroop heard a conversation on the target telephones indicating that an unknown source, identified as Alex, was looking to reestablish a narcotics relationship with Mr. Earnest. On June 12, the agents picked up the conversation again, intercepting conversations pertaining to a distribution of narcotics, first identified as five kilograms, and later as ten kilograms, that was to take place shortly.

The agents continued to monitor the conversations into June 13. They learned

from their interceptions that Spencer Mitchell, Eric Earnest and Sammy Jefferson planned to meet at the St. Louis airport.  Sammy Jefferson apparently did not have a car and needed Eric Earnest to pick him up.  Prior to this time, the agents, through the course of their investigation, had learned of involvement by an individual named "Spence," but they had not yet identified "Spence" as Spencer Mitchell.

Based on their investigation, a surveillance team was assembled.  TFA Christiansen was advised early in the morning of June 13 that a narcotics transaction was possibly taking place between Earnest, Jefferson and Mitchell, and he and his partner, Jason Stats, were assigned to surveillance.  Prior to this time, TFA Christiansen was familiar with Jefferson and Earnest, but not with Mitchell.  Meanwhile, SA Stroop continued to monitor the conversations.  He learned that the location was changed to a Steak 'N Shake near the airport, at Highways 170 and 70 and Natural Bridge, and this information was communicated to the surveillance team.  As a result, TFA Christiansen and his partner proceeded to the Steak 'N Shake in separate cars and set up surveillance. The agents later learned through their interceptions that the location was changed to a Motel 6 in the same area, and as the location was changed, the updated information was transmitted to the surveillance team.

Consistent with the information the agents had received, Eric Earnest picked up Sammy Jefferson, driving a black Mercury Marauder.  TFA Christiansen saw Earnest and Jefferson pull onto the restaurant parking lot in the black Marauder.  Jefferson, who was on the passenger side of the vehicle, got out and entered the restaurant.  Earnest pulled

the Marauder directly behind a black Chevy Impala, which the agents later determined was driven by Defendant Mitchell. Thereafter, Earnest pulled the Marauder back around, and Jefferson exited the restaurant and began to converse with Earnest. After they spoke, Earnest drove off the lot. TFA Christiansen followed Earnest, while his partner remained behind.

Earnest drove to the Airport Diner, located at Woodson and Natural Bridge, where he circled the lot, doing what appeared to be looking for surveillance. Earnest then drove across the street to the Motel 6 lot, and got on his cell phone. TFA Christiansen stationed himself on the Airport Diner parking lot, directly across from Earnest. In the meantime, TFA Christiansen was informed by his partner that Mitchell and Jefferson were headed toward him. Jefferson, who had previously been in Earnest's car, was now in Mitchell's Impala, and they pulled up next to Earnest's vehicle. Earnest got out of the car, and walked around the lot, as though attempting to locate surveillance. Earnest and Jefferson also got out and walked around the parking lot, doing the same. The three suspects then returned to the back of their vehicles, engaged in conversation, and then walked to the Marauder. Either Jefferson or Earnest opened the trunk and then one of them, the witness believed it was Earnest, took a black bag from the trunk of the car and handed it to Defendant Mitchell. Mitchell took the bag, placed it in the trunk of his Impala, and then drove off, alone, heading east on Highway 70, toward downtown. After the exchange, TFA Christiansen advised TFA Sawyer and SA Stroop of what he had observed.

After transmitting this information by radio, TFA Christiansen followed Defendant

Mitchell on eastbound Highway 70. He followed Defendant Mitchell from the lot until immediately before the ultimate traffic stop, and was continuously in contact with Defendant's car, approximately a few car lengths behind. As he followed Defendant, he advised the other agents of Defendant's location.

Meanwhile, SA Stroop contacted TFA Sawyer and advised him that two agents had observed an exchange of a black bag from the trunk of one car to the trunk of another, and of their belief that the bag contained narcotics. Based on this information, TFA Sawyer called Officer Joyner, with the Mobile Reserve unit, and informed him of the investigation and the transfer of the bag, and told him that he wanted the car to be stopped. The Task Force had worked with Mobile Reserve officers before, and they wanted to use local police because they believed that if the suspects learned that federal agents were involved, it would compromise their long-standing federal investigation. The vehicle was described to Officer Joyner as a black Chevy Impala, with Illinois temporary tags, that might be headed over to Illinois, and he was told to be in the downtown area.

Officer Joyner, Sergeant Smoot, and Officer Cliff Summers set up surveillance on the St. Louis Avenue ramp, approximately 1-2 miles from the downtown St. Louis exit, and waited. They were in a marked vehicle, which Sgt. Smoot was driving. When they saw the Impala pass by on Highway 70, they entered the highway, approximately five car lengths back. The officers did their best to catch up to Defendant's car, but were unable to do so because of traffic. At the time, the officers were aware that Task Force officers were also following Defendant. Indeed, TFA Christiansen observed the marked vehicle

behind him, and thereafter saw the police car pass him in an effort to catch up to the Impala. Right before the Martin Luther King bridge, the Impala, which had been driving in the middle lane, swerved over two lanes and exited. This action by the Impala was a Missouri traffic violation. The officers in the marked vehicle attempted to catch up, but could not do so, and they followed the Impala as it drove over the bridge to Illinois.

The officers, who had visual contact of the Impala the entire time, did not activate their lights prior to going over the bridge. They did not do so, in part, because they were not close enough to Defendant's car. Defendant was driving what was described as a "muscle car"; the officers knew that if they were not close enough, and Defendant attempted to take off, they would not be able to catch him. Additionally, the officers knew that once Defendant entered the bridge, there was no place where they could pull Defendant's vehicle over.

The officers followed Defendant over the bridge to Illinois, at which point they activated their roof lights, at approximately the St. Clair exit. From the time they first observed the Impala pass St. Louis Avenue, until they pulled the car over, the officers were continuously following the car, and had constant visual contact. Defendant pulled his car over, and Sgt. Smoot approached the driver's side door, while Officer Joyner remained near the back bumper of the car. Sgt. Smoot asked Defendant to step out of the car and go to the rear of the car. This was done for officer safety, as they were on the side of the highway.

Defendant walked to the back of the car, and asked what was wrong. The officers

advised him that he had made an illegal lane change at Highway 70 and Dr. Martin Luther King Drive. Officer Joyner asked Defendant if he had anything illegal in the car, and Defendant shook his head, "No." They asked if Defendant would mind if they searched the car, and Defendant shrugged his shoulders and quietly said, "No," indicating that he did not mind if they searched. He did not ask Defendant to sign a written consent to search form. Officer Joyner did a quick sweep of the inside of the car, for weapons, and then proceeded to the trunk. He opened the trunk and saw a large black bag. He unzipped the bag and saw cocaine inside. At some point, Defendant was issued a ticket for illegal lane usage.

Officer Joyner contacted TFA John Bradley, a DEA Task Force Agent in Illinois. TFA Bradley told him to take the car off the highway and contact the Illinois State Patrol. Officer Joyner contacted the Illinois State Highway Patrol, perhaps through the dispatcher. He was advised that the Illinois State Highway Patrol wanted them to move Defendant off of the highway, because it was dangerous, and they were advised to meet the Illinois State Highway Patrol at 25th Street.

The officers placed Defendant in handcuffs, put him in the back of their patrol car, and Officer Joyner advised Defendant of his rights under Miranda. They advised Defendant that there was an investigation going on, and that they were going to detain him for further investigation. They then drove their vehicle, with Defendant inside, to 25th Street. The officers did not ask Defendant any questions, and he did not make any statements. Officer Summers drove Defendant's car to 25th Street, as directed by the

Illinois Highway Patrol. The black bag was still in the trunk of the Impala, and had not been removed while on the highway.

Once they got off the highway, the officers were met by Illinois State Highway Patrol officers, who took custody both of Defendant and the black bag, and the Illinois authorities escorted them to the patrol office. Inside the bag was ten kilograms of cocaine. The Illinois State Highway Patrol thereafter took over the case.

## CONCLUSIONS OF LAW

### A.  The Stop and Arrest of Defendant

Defendant makes a single argument in support of his motion to suppress evidence. He asserts that the St. Louis police officers "lacked the legal authority to make a traffic stop, arrest, or seizure in the State of Illinois." Both Defendant and the government analyze the officers' authority solely under the Illinois "fresh pursuit" statute, 725 Ill. Comp. Stat § 5/107-4. Defendant asserts that the officers were not engaged in "hot pursuit" or "fresh pursuit," because Defendant was not attempting to flee from any pursuit, while the government asserts that the officers' conduct is authorized by the statute as construed by the case law.

For reasons discussed below, the Court does not believe that the validity of either the arrest or the search is dictated by state law. However, because the validity of the arrest under Illinois state law could have some bearing on the determination, and because it is the sole argument made by the parties, the Court will first address the validity of the stop under Illinois law.

1. <u>Illinois Fresh Pursuit Statute</u>

The parties both argue that the validity of Defendant's arrest is governed by the law of Illinois, where the arrest occurred. The Illinois fresh pursuit statute, 725 Ill. Comp. Stat. § 5/107-4(b), which specifically allows for arrest by officers from other jurisdictions, provides:

> Any peace officer of another State who enters this State in fresh pursuit and continues within this State in fresh pursuit of a person in order to arrest him on the ground that he has committed an offense in the other State has the same authority to arrest and hold the person in custody as peace officers of this State have to arrest and hold a person in custody on the ground that he has committed an offense in this State.

Section 107-4(a)(3) defines "fresh pursuit" as "the immediate pursuit of a person who is endeavoring to avoid arrest."

Defendant asserts that the statute does not apply because he was unaware of the pursuit until the officers activated their lights in Illinois, and because he pulled over once the officers activated their lights. Relying solely upon the statutory language, he asserts that he at no time attempted to flee from any pursuit, as required by the statute. Citing to case law under the statute, the government asserts that the officers were engaged in "fresh pursuit," as the case law requires only that the pursuit be "continuous, uninterrupted and without unreasonable delay."

Though not cited by Defendant, the Court has found Illinois state cases that reference an "attempt to flee" the jurisdiction, when discussing the statute. <u>See</u>, <u>e.g.</u>, <u>People v. Marino</u>, 400 N.E.2d 491, 494 (Ill. App. Ct. 1980) ("[t]his exception is clearly

not applicable to the case at bar, because the burglary was not committed in the City of Chicago and defendants were not attempting to flee the jurisdiction of the arresting officers"); People v. Carnivale, 315 N.E.2d 609,613 (Ill. App. Ct. 1974) ("[T]he trial judge did not believe that Carnivale was fleeing in an attempt to avoid the police or that Officer Aron was in immediate pursuit of Carnivale."). However, those cases often did not involve facts at all analogous to the facts at hand. For example, in Marino, Chicago officers began conducting day time surveillance on Defendant and another suspect based upon the fact that they matched the description of individuals observed leaving the scene of a burglary in Chicago. Eight days after the investigation began, while still conducting covert surveillance, the officers observed the defendant and the other suspect commit a burglary of an apartment in Wood Dale – outside the jurisdiction of the Chicago officers – and they arrested the two outside the building. As such, there was no pursuit, whatsoever, following the offense at issue. Likewise, in Carnivale, Chicago police officers had a search warrant, authorizing the search of the automobiles of the defendant and another. They observed the defendant driving outside of Chicago, in the Village of Forest Park, and attempted, unsuccessfully, to overtake him on the freeway to execute the warrant. The officers were thereafter "content to trail the defendant on the expressway," and followed him to a hotel, where he met with the other individual for whom they had a search warrant. Inside the hotel lobby, the officers approached, executed the warrants and arrested and searched a third person with the defendant. As noted by the court, "[t]he officer did not even imply that he had pursued Carnivale out of Chicago." Id. at 613.

10

The Court notes that the statute, itself, nowhere references "flight." Rather, it only speaks to "immediate pursuit" of a person "who is endeavoring to avoid arrest." Here, there is no question that the officers were in the "immediate pursuit" of Defendant, having witnessed a drug transaction they had cause to believe involved ten kilograms of cocaine. It is also clear that the three Defendants were actively attempting to avoid detection and arrest. After meeting at one location, they moved to a second location. At the location where the transaction occurred, all three defendants circled the lot, looking for surveillance. Then, immediately after the transaction, Defendant got on the highway and took a quick exit to Illinois, illegally crossing two lanes to do so. Looking solely to the statutory language, these facts could support a finding that Defendant was, in fact, "endeavoring to avoid arrest."

There are also Illinois state cases that support application of the statute under these circumstances. In People v. Clark, 360 N.E.2d 1160 (Ill. App. Ct. 1977), the defendant was arrested in Missouri by Illinois police following the robbery of a jewelry store in Illinois. In that case, there is no indication that the defendant was aware that the police were following him. Indeed, Cairo, Illinois police summoned to assist with locating the suspects did not spot them until the officers were seven miles past the border into Missouri. The court held that "fresh pursuit" did not require "continuous surveillance of a fleeing suspect or the uninterrupted knowledge of his whereabouts." Id. at 1164. All that was required was that the pursuit be "continuous, uninterrupted and without unreasonable delay." Id. Although Clark involved an arrest in Missouri by Illinois

officers, and application of the Missouri fresh pursuit statute, which uses different language, the court found the requirements for "fresh pursuit" under Illinois and Missouri law to be roughly equivalent, each stemming from the common law. Id. at 1163 ( "Thus, it is apparent that under both Illinois and Missouri law the arrest in this case can be sustained only if it fits within the definition of 'fresh pursuit.'").

People v. Wolfbrandt, 469 N.E.2d 305 (Ill. App. Ct. 1984), *overruled in part on other grounds by*, Daley v. Hett, 495 N.E.2d 513 (Ill. 1986), involved facts fairly analogous to the facts presented here. There the defendant argued that the fresh pursuit statute could not apply because defendant was not fleeing from his pursuers, and was never even aware of the officers behind him. The court rejected this argument, finding that knowledge of the pursuit by the suspect is not required for fresh pursuit. Id. at 310. As in Clark, Wolfbrandt involved an arrest in Missouri by Illinois agents who, while conducting surveillance of defendant in Iowa, witnessed him commit a felony. Although the court in Wolfbrandt was also construing the Missouri statute, it specifically held that the result would be the same under the Illinois statute.

> While the Illinois fresh pursuit statute is not applicable to this case, even if it were, we believe that the phrase "endeavoring to avoid arrest" does not mean that a person must be consciously aware of the pursuit, but rather that a person is fleeing the scene of the crime to avoid arrest

Id.

On these fact, there is no question that the officers were in immediate and continuous pursuit of Defendant, following his commission of a crime in Missouri, and that they endeavored to catch up to him while in Missouri, but were unable to do so. And

while it is not at all free from doubt, the Court also finds that Defendant was "endeavoring to avoid arrest" within the meaning of the Illinois fresh pursuit statute. As such, Defendant's argument that the officers had no authority to stop and arrest Defendant in Illinois fails.

    2.  Citizen's Arrest under Illinois Law

Though not addressed by either party, even if the officers' initial stop and arrest of Defendant in Illinois were not covered by the fresh pursuit statute, it would still be valid as a citizen's arrest under Illinois law. While fresh pursuit was the sole exception at common law to the rule that officers had no authority to arrest a defendant outside their territorial limits, Illinois has recognized that the common law has been modified by the court's interpretation of 725 Ill. Comp. Stat. § 5/107-3, pertaining to arrests by private persons. People v. Lahr, 589 N.E.2d 539, 540 (Ill. 1992). Secton 107-3 provides:

> Any person may arrest another when he has reasonable grounds to believe that an offense other than an ordinance violation is being committed.

The Illinois courts construing section 107-3 have found this statute to apply equally to police officers, holding that "a warrantless arrest made by a police officer outside of his jurisdiction may constitute a valid citizen's arrest," and that "a police officer acting outside his jurisdiction retains all of the rights of an ordinary citizen, including the right to effect a citizen's arrest." Id. (citations omitted); accord People v. Shick, 744 N.E.2d 858, 863 (Ill. App. Ct. 2001). "Extraterritorial arrests have been upheld pursuant to this provision where the arresting officer had probable cause to

believe that defendant had committed an offense within the officer's jurisdiction."

People v. O'Connor, 520 N.E.2d 1081, 1083 (1988).

Here, there is no dispute that Officer Joyner observed Defendant commit a traffic offense, which is a violation of Missouri law, within his own jurisdiction, a fact that Defendant does not contest. As such, he was authorized to effect a citizen's arrest in Illinois based upon the traffic offense. See id. at 1084-85 (upholding extraterritorial arrest for speeding violation committed in officer's jurisdiction); People v. Gupton, 487 N.E.2d 1060, 1063 (Ill. App. Ct. 1985) (upholding extraterritorial arrest for driving in the wrong lane -- which the court noted was not an ordinance violation, but rather a violation of the Illinois vehicle code -- and for driving under the influence of alcohol); People v. Rowe, 471 N.E.2d 578, 580 (Ill. App. Ct. 1984) (upholding extraterritorial arrest for improper lane usage and driving under the influence of alcohol). Defendant also does not dispute that the officers had probable cause to believe Defendant had purchased and was continuing to possess with intent to distribute a large quantity of cocaine. As such, the officers were also authorized to effect a citizen's arrest based on their reasonable belief that Defendant had committed this felony offense. See Shick, 744 N.E.2d at 863 (upholding exterritorial arrest where officer, based on police radio bulletin, had reasonable ground to believe defendant had committed an armed robbery). Indeed, the court in Shick further recognized that this statute would permit an investigatory stop, as well. Id.; accord People v. Leinweber, 600 N.E.2d 901, 902 (Ill. App. Ct. 1992).

The Illinois cases also recognize that "when outside his jurisdiction a police

14

officer's right to arrest is no greater than that of a private citizen," and on this basis have refused to uphold extraterritorial arrests where the officer has used "the powers of his office to obtain evidence not available to private citizens." Lahr, 589 N.E.2d at 540. This limitation has been confined, however, to the use of investigatory techniques that would not be available to private citizens *while the officer is outside his jurisdiction*. Officers may use their police powers within their jurisdiction, and thereafter effect an arrest outside their jurisdiction, so long as the reasonable belief is based on the use of police powers within the officer's jurisdiction. People v. Elliott, 785 N.E.2d 545, 548 (Ill. App. Ct. 2003). Here, the SLMPD officer did not use any police powers not available to a private citizen to observe the traffic offense, and any police powers used to develop probable cause to believe Defendant was engaged in an illegal drug transaction occurred within the officers' lawful jurisdiction.

Nor does the officers' subsequent use of their police powers, including use of their lights to effect the stop, use of their authority to request Defendant to step out of the car and consent to search, or their subsequent physical arrest of Defendant, invalidate use of this statute. The Illinois case law is clear that if an officer properly develops the necessary reasonable belief that an offense has been committed, within the meaning of the statute, the officer may thereafter use his or her police powers both to effect the arrest and to gather further evidence. See People v. Kleutgen, 833 N.E.2d 416, 420-21 (Ill. App. Ct. 2005) (holding use of emergency lights and other equipment not available to private person did not invalidate citizen's arrest since equipment was not used to gather

15

evidence that led to defendant's arrest); <u>Shick</u>, 744 N.E.2d at 863-64 (upholding use of

police radio to communicate location to police dispatcher, use of mars light, and gun to

effect citizen's traffic stop); <u>People v. Ciesler</u>, 710 N.E.2d 1270, 1274-75 (Ill. App. Ct.

1999) (holding that having already obtained enough evidence to warrant traffic stop,

officer effecting citizen's arrest could use power of office to obtain additional evidence

by asking for driver's license and conducting field sobriety tests). As such, both the

traffic stop and subsequent arrest of Defendant was valid as a citizen's arrest under the

Illinois law.

    3. <u>Validity under Fourth Amendment</u>

    Assuming *arguendo* the officers' actions outside their territory were not authorized

by Illinois law, that would not change this Court's determination. The fact is that the

parties have applied the wrong legal standard. The Eighth Circuit has rejected the notion

that an arrest in violation of state law necessarily also constitutes a violation of the Fourth

Amendment. <u>Abbott v. City of Crocker</u>, 30 F.3d 994, 998 (8th Cir. 1994).

> "[T]he question here is not whether the search was authorized by state law.
> The question is rather whether the search was reasonable under the Fourth
> Amendment. Just as a search authorized by state law may be an
> unreasonable one under that amendment, *so may a search not expressly
> authorized by state law be justified as a constitutionally reasonable one.*"

<u>Id.</u> at 997-98 (emphasis in original) (quoting <u>Cooper v. California</u>, 386 U.S. 58, 61

(1967)). In <u>Abbott</u>, a motorist asserted claims under 42 U.S.C. § 1983, alleging that a

police officer used excessive force and had no authority to effect an arrest for a traffic

offense outside the city limits. The majority concluded that while compliance with state

16

law might be a relevant factor in determining whether police conduct was reasonable for Fourth Amendment purposes, a violation of state law would not itself establish a violation of the Constitution. Id. at 998.

The following year, a different panel of the Eighth Circuit reversed an order of a district court suppressing cocaine seized from the defendant, where the district court had based its ruling on the fact that the arrest had been unlawful under Iowa law. See United States v. Bell, 54 F.3d 502, 504 (8th Cir. 1995). Paying no deference to the legality under state law, the Court reasoned:

> Because states may impose rules for arrests, searches, and seizures that are more restrictive than the Federal Constitution, state law violations do not necessarily offend the Federal Constitution. . . . Thus, when a federal court must decide whether to exclude evidence obtained through an arrest, search or seizure by state officers, the appropriate inquiry is whether the arrest, search, or seizure violated the Federal Constitution, not whether the arrest, search, or seizure violated state law. . . .
>
> A federal court generally does not look to state statutes to assess the validity of an arrest, search, or seizure under the Fourth Amendment. . . . Fourth Amendment analysis requires reference to state law in only a few situations. See 1 Wayne R. LaFave, Search and Seizure § 1.5, at 34 (2d ed. Supp. 1994). For example, to show the reasonableness of an inventory search, the Government must show officers complied with state standardized procedures. Id. Nevertheless, we do not think Fourth Amendment analysis requires reference to an arrest's legality under state law. . . . An arrest by state officers is reasonable in the Fourth Amendment sense if it is based on probable cause.

Id. at 503-04 (citations omitted). The Court again adopted this approach, with some reservations, in United States v. Lewis, 183 F.3d 791, 794 (8th Cir. 1999). In Lewis, the Court upheld an arrest that violated Minnesota state law, and the search incident to that

arrest, finding that "the appropriate inquiry here is not whether Lewis's arrest was valid under Minnesota's criminal procedure statute, but rather under federal law." Id.

There does appear to be a split in the circuits regarding whether an officer's lack of authority under state law to conduct an arrest, which is otherwise constitutionally valid, constitutes an unreasonable seizure under the Fourth Amendment. Santoni v. Potter, 369 F.3d 594, 598-99 (1st Cir. 2004) (recognizing split and declining to reach issue); United States v. Atwell, 470 F. Supp. 2d 554, 573 (D. Md. 2007) (recognizing split). The view expressed by Bell and Abbott, however, continues to be the law of this Circuit. See, e.g., United States v. Stonerook, 134 Fed. Appx. 982, 984 (8th Cir. 2005) (following Bell); United States v. Barraza-Maciel, 2006 WL 1441618 (D. Neb. 2006) (following Bell); United States v. Peach, 327 F. Supp. 2d 1081, 1086 (D.N.D. 2004) (following Abbott). Moreover, the law expressed by this Circuit appears to express the emerging majority. Atwell, 470 F. Supp. 2d at 573 (collecting cases). Thus, to determine whether Defendant's Fourth Amendment rights were violated, the court looks to the totality of the circumstances surrounding the incident. United States v. Flores-Sandoval, 474 F.3d 1142, 1145 (8th Cir. 2007).

On these facts, it is clear that the officers' actions were proper under the Fourth Amendment. When a police officer observes a traffic violation – however minor – he has probable cause to stop the vehicle. Whren v. United States, 517 U.S. 806, 818 (1996); United States v. Martin, 411 F.3d 998, 1000 (8th Cir. 2005). "This is true even if a valid traffic stop is a pretext for other investigation." United States v. Linkous, 285 F.3d 716,

719 (8th Cir. 2002). Here, the evidence is undisputed that Officer Joyner personally observed a traffic offense committed by the Defendant. As such, the officers had probable cause to stop the car.

Once an officer has a right to stop a driver, the officer may "conduct an investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'" United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (quoting United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990)). "This reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." Id.; United States v. Jones, 269 F.3d 919, 924-5 (8th Cir. 2001). When "'the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.'" United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995) (quoting United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993)); accord, United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995) (officers are permitted to graduate responses to the demands of the particular situation).

Police officers may also briefly detain an individual for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). The reasonable belief requires suspicion based on "'particularized, objective facts which, when taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" United

States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)).  "A series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together." Bloomfield, 40 F.3d at 918.  The court also considers what certain conduct would suggest to experienced officers in the field, who have been trained in the observation of criminal activity.  Id. at 915.

Here, the officers had far more than reasonable suspicion to believe that Defendant was engaged in a narcotics transaction, and that the narcotics were located in the trunk of his car.  As such, the officers acted reasonably, and did not exceed the scope of the stop, in requesting consent to search the car.  See  United States v. Yang, 345 F.3d 650, 654 (8th Cir. 2003) ("the time it takes for an officer to find out if consent will be given cannot be an unlawful detention in the absence of coercive or otherwise unusual circumstances"); see also Florida v. Royer, 460 U.S. 491, 501 (1991) (plurality opinion) (when officers have no basis for suspecting an individual, they may ask questions and request consent to search his or her luggage);  United States v. Blaylock, 421 F.3d 758, 769 (8th Cir. 2005) (passenger's extreme nervousness, combined with presence of masking odors, contradictory statements, and driver's vague reasons for trip, provided reasonable cause to detain vehicle for canine search), cert. denied, 546 U.S. 1126 (2006).

Indeed, it is clear that prior to the stop, the officers had probable cause to arrest Defendant for drug trafficking.  An arrest is lawful even if made without a warrant, if the arrest is made with probable cause.  See United States v. Watson, 423 U.S. 411, 417

(1976). Probable cause exists "when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested." United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003) (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001)); accord United States v. Travis, 993 F.2d 1316, 1323 (8th Cir. 1993) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). Officers are not required to rule out all innocent explanations, nor are they required to be able to prove a case beyond a reasonable doubt to effect a warrantless arrest. Maryland v. Pringle, 540 U.S. 366, 371 (2003); Illinois v. Gates, 462 U.S. 213, 235 (1983). The test is an objective one, and does not turn on the subjective belief or intent of the police officers. United States v. Sherrill, 27 F.3d 344, 346-47 (8th Cir. 1994). Moreover, in making this determination the court may consider the collective knowledge of all of the law enforcement officers if, as here, there is some degree of communication. United States v. Morales, 238 F.3d 952, 954 (8th Cir. 2001)

The officers involved in this investigation had cause to believe that a ten kilogram cocaine transaction was going to occur on the 13th, involving Earnest, Jefferson and "Spence." They already knew, from their on-going investigation, that Earnest and Jefferson were engaged in narcotics trafficking. Through their surveillance, they confirmed what they had heard about the proposed transaction, as the Defendants appeared as arranged. Defendants thereafter took actions to try and ensure that they were not being observed, including moving the location and looking for surveillance. From

their personal observations, and in light of their experience, the officers had reasonable cause to believe that the Defendant had just engaged in a substantial narcotics transaction and that the drugs were located in the bag in his trunk. Thus, prior to the actual stop, the officers already possessed probable cause to arrest Defendant. As such, based on all of the circumstances, the Court finds the stop and subsequent arrest of Defendant to be valid.

Even if the Court were to assume that the officers lacked authority for the stop under Illinois law, and to follow the test in Abbott -- which would consider the lack of jurisdiction as a factor -- that fact would not cause a different determination under the Fourth Amendment. Here, the officers had probable cause to believe both that Defendant had committed a traffic offense, and that he was engaging in drug trafficking. Thus, the state of Illinois would presumably have a strong interest in having drug traffickers within their state apprehended. In terms of their own conduct, the officers were in continuous pursuit of Defendant and made an effort to catch up to him before he suddenly crossed over to take the bridge to Illinois. Thus, they did not unnecessarily create the situation.

Moreover, the officers had a strong need for immediate action. Had they not stopped Defendant, he likely would have evaded apprehension at that time. Indeed, if the car license was not enough to lead to Defendant's identification, the officers may not have been able to apprehend Defendant at all. At this point in the investigation Defendant had not been positively identified, and was known only as "Spence." Even if the officers were able later to locate Defendant, the cocaine would probably be gone.

Finally, the officers did not flagrantly violate the statute after the stop.  They promptly notified the Illinois authorities and followed the directions of the Illinois State Police, who immediately took custody of Defendant and the narcotics.

**B.  Search of the Car**

1. Probable Cause

Following the stop, the officers were authorized to search the trunk of the car on at least two independent grounds.  First, as set forth above, here the officers had probable cause to believe that Defendant's automobile contained narcotics.  See Maryland v. Dyson, 527 U.S. 465, 467 (1999) (holding police had probable cause to believe car contained narcotics because car matched informant's description and had been rented by "known drug dealer").  They were therefore authorized to conduct a warrantless search of the car and of the package in the trunk, under the "automobile exception."  United States v. Ross, 456 U.S. 798, 804-09, 821 n.28 (1982) (recognizing that "prohibiting police from opening immediately a container in which the object of the search is most likely to be found and instead forcing them first to comb the entire vehicle would actually exacerbate the intrusion on privacy interests"); California v. Acevedo, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.").

2. Consent to Search

The officers were also authorized to search the car pursuant to Defendant's consent.  A warrantless search may be conducted based on an individual's voluntary

consent. <u>Schenckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973). Such consent may be express or implied, and while the consent must be voluntary, it need not necessarily be knowing and intelligent. <u>Id.</u> at 241; <u>United States v. Hogard</u>, 254 F.3d 744, 746 (8th Cir. 2001). One need not be aware of his or her right to consent in order to make the consent voluntary. <u>United States v. Chaidez</u>, 906 F.2d 377, 380 (8th Cir. 1990). A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress. In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given. <u>Id.</u> at 381. Voluntariness is a factual question to be determined from the totality of the circumstances present. <u>Schneckloth</u>, 412 U.S. at 226-227; <u>United States v. Matlock</u>, 415 U.S. 164 (1974). The factors to be considered in determining whether consent is voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

<u>United States v. Alcantar</u>, 271 F.3d 731, 737 (8th Cir. 2001). Among the factors to be considered when examining the environment surrounding the consent are: the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether

the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred.  United States v. Smith, 260F.3d 922, 924 (8th Cir. 2001); Chaidez, 906 F.2d at 381.  Courts also consider "whether the defendant's contemporaneous reaction to the search was consistent with consent."  United States v. Jones, 254 F.3d 692, 696 (8th Cir. 2001).  The foregoing factors are not to be applied mechanically, and no single factor is dispositive.  Schneckloth, 412 U.S. at 226-27; Chaidez, 906 F.2d at 381.  Moreover, "[t]he precise question is not whether [the defendant] consented subjectively, but whether his conduct would have caused a reasonable person to believe he consented."  Jones, 254 F.3d at 695.

Here, Defendant voluntarily consented to the search of his car.  The record reflects that at the time of these events, Defendant was a 28 year old adult.  The Court notes that the request to search was made during a traffic stop, during the daylight hours, and on the side of the highway.  At that time, Defendant had not been restrained in any fashion, and the request was made almost immediately after the stop.  Further, no promises or threats were made to induce Defendant to provide his consent.  Although Defendant was not advised of his Miranda rights prior to the search, such advice is not required.  Under the totality of the circumstances, the Court finds Defendant was voluntary.

### C.  Motion to Suppress Statements

It is unclear whether Defendant is seeking to suppress the few statements made by him on any ground other than the asserted unlawful nature of the arrest.  To the extent Defendant seeks to suppress his statements as the fruit of an unlawful arrest, that motion

fails in light of the Court's finding that there was no Fourth Amendment violation. The only statements that appear to have been made by Defendant are his negative response to the question of whether he had anything illegal in the car, as well as his consent to search. To the extent Defendant is asserting that these statements should be suppressed on independent grounds, the Court also finds no basis.

The Supreme Court has recognized that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Berkemer v. McCarty, 468 U.S. 420, 440 (1984). However, "'most Terry stops do not trigger the detainee's Miranda rights.'" United States v. Martinez, 462 F.3d 903, 909 (8th Cir. 2006), cert. denied, 127 S.Ct. 1502 (2007) (quoting United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003)).

On these facts, the Court finds the officers were not required to advise the Defendant of his rights under Miranda. The questioning by the officers was minimal and directly related to the officers' reasonable suspicions. Again, the encounter took place during the daytime, in full public view. Defendant was not patted down or restrained in any manner, and there is no evidence that force of any sort was displayed or exerted during the course of these few questions. As such, under the totality of the circumstances, the Court finds that Defendant was not in custody for purposes of Miranda, and his statements made during the course of the brief investigation are not subject to suppression. See United States v. Martin, 411 F.3d 988, 1002-3 (8th Cir. 2005)

26

(holding that after traffic citation was issued and drug dog thereafter alerted to presence of drugs, officer was not required to advise defendant of <u>Miranda</u> warnings, and defendant's response to question about presence of drugs in car was not subject to suppression); <u>Pelayo-Ruelas</u>, 345 F.3d at 593 (holding that where defendant was removed from car and patted down in connection with drug investigation, <u>Miranda</u> warnings were not required and statements were not subject to suppression, where only one agent approached and questioned defendant, agent was in plain clothes and did not draw weapon, atmosphere was like typical traffic stop, and investigation was reasonably limited to confirming or dispelling suspicions).

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Motion to Suppress Statements [Doc. Nos. 253 and 254] be **denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir.1990).

AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 12th day of October, 2007.